**C.N.S., INC., d/b/a Community Nursing Services, Inc. and Sunrise Nursing Services, Inc., Plaintiffs,**

**v.**

**CONNECTICUT GENERAL LIFE INSURANCE CO. and Allied Signal Corp., Defendants.**

**No. 95 CV 1936(TCP).**

United States District Court,
E.D. New York.

June 23, 1998.

Henry F. Jones, Bellmore, NY, William J. McLeod, Boston, MA, for C.N.S., Inc., Gloria Steiner.

William J. McLeod, Boston, MA, for Sunrise Nursing Services, Inc.

Kevin J. Brennan, Dwyer & Brennan, New York City, for Connecticut General Life Ins. Co.

Daniel H. Murphy, III, New York City, Kevin J. Brennan, Dwyer & Brennan, New York City, for Alliedsignal Corp.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Before this Court are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth herein, the parties' motions are granted in part and denied in part.

## BACKGROUND

Defendant AlliedSignal, Inc. ("Allied") established medical and other benefit plans for its employees and retirees. One of those plans was the AlliedSignal Retiree Medical Plan (the "Plan"), the terms of which were stated in a document entitled Summary Plan Description ("SPD"). Gloria Steiner was a beneficiary under the Plan. In 1994, 1995 and 1996, Mrs. Steiner received nursing services from C.N.S., Inc. d/b/a Community Nursing Services ("CNS") in her Huntington home.[1] In return for all services Mrs. Steiner re-

ceived from CNS, she assigned CNS her right to benefits under the Plan.

In general, the Plan provided benefits for medical practitioners under contract with the Plan (called network benefits) and also provided benefits for other practitioners, not under contract with the Plan (called out-of-network benefits). CNS was not a network provider under the Plan, and the rights it obtained from Mrs. Steiner were rights to out-of-network benefits available under the terms of the Plan.

The Plan gave the plan administrator *full discretionary authority and power ... to determine eligibility for Plan benefits, to interpret and construe the terms and provisions of the Plan, [and] to determine questions of fact and law....* The Plan also authorized the plan administrator to delegate its responsibilities to others, including the discretionary authority to interpret Plan terms and to determine eligibility for benefits.

The SPD identified Allied as the Plan administrator. Pursuant to the SPD, Allied delegated certain tasks to defendant Connecticut General Life Insurance Company ("CGLIC"), including the administration of claims made for benefits under the terms of the Plan. For out-of-network benefits, the SPD provided that the Plan would pay eighty percent of the reasonable and customary rate for private duty nursing only if the nursing was both recommended by a physician and essential for the necessary care and treatment of an injury or illness. The SPD authorized the Plan administrator to regard charges as reasonable and customary if they: (1) were the normal charge used by the particular nursing service; and (2) did not exceed the normal charge made by most nursing services in the locality where the patient lived.

The Plan identified a nurse as an R.N., L.P.N., or L.V.N., other than a member of the patient's family, who performs professional nursing services at the direction of a physician. While the Plan covered professional nursing services, it did not pay a bene-

---

1. Mrs. Steiner suffered from asthma, diabetes, and other ailments, allegedly requiring 24–hour home health care. CNS, which provides medical services to chronically and terminally ill patients, provided Steiner with such care since February 18, 1995.

fit for custodial care, which the Plan defined as not skilled or marked by watching and protecting, rather than seeking to cure.

In March 1995, the Plan, acting through CGLIC, agreed to pay CNS for its covered services at a rate of $55 per hour. During the litigation brought by CNS, plaintiffs' attorney and CGLIC affirmed the agreement to pay the $55 rate, while retaining the right to contest the balance. From approximately March 1995 through February 1997, the Plan paid CNS at the $55 rate for those nursing services that the Plan regarded as covered under the terms of the Plan.

On January 3, 1997, this Court ordered the parties to perform an expedited claim procedure so that CNS and Mrs. Steiner (who was then a plaintiff) would exhaust the Plan's remedies before seeking judicial relief. The Court set deadlines for the parties to exchange documentation, submit proof in support of their claims, and to appeal and respond from any denial of the claim. The parties complied with the Court's schedule.

Having considered CNS's submissions and other evidence, the Plan representative, Karen Welz, approved parts of the claim and denied parts. Plaintiff appealed from the partial denial and, on March 17, 1997, the Plan denied plaintiff's appeal.

## DISCUSSION

### A. Summary Judgment Standard

A Court may grant summary judgment "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact, *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990), and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c).

### B. Applicable Legal Standards

ERISA comprehensively regulates plans established or maintained by employers or employee organizations that provide benefits for employees. *See, e.g., Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). The civil enforcement section of ERISA, Section 502, 29 U.S.C. § 1132, authorizes a plan beneficiary to sue to recover benefits due under the terms of the Plan. 29 U.S.C. § 1132(a)(1)(B).

■ When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of plan documents and to determine eligibility for benefits under those terms, the district court must review those interpretations and determinations deferentially. *See, e.g., Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Miller v. United Welfare Fund,* 72 F.3d 1066, 1070 (2d Cir.1995). The Court should reverse the decision to deny benefits only if the Court finds that decision to have been arbitrary and capricious, that is, without reason [and] unsupported by substantial evidence or erroneous as a matter of law. *Miller,* 72 F.3d at 1070 (quoting *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995)).

■ When the district court considers whether a denial is arbitrary and capricious, it should consider only the administrative record, that is, evidence that the plan fiduciary considered when it denied the claim. *Miller,* 72 F.3d at 1071. If the Court were to entertain arguments and evidence not placed before the plan when it denied the claim, then district courts would function as substitute plan administrators, contrary to Congress' intention. *Id.*

### C. The Cross–Motions

#### 1. Arguments in General

In sum, plaintiffs assert they are entitled to summary judgment on the grounds that defendant was arbitrary and capricious in its denial of benefits to the plan beneficiary. Defendants, on the other hand, argue that Allied's benefit plan expressly granted the administrator discretion to interpret plan terms and to decide benefit claims. Because its agent CGLIC's claim determination was rationally based on the evidence, defendants urge that this Court should defer to the administrator's decision, and dismiss the Amended Complaint. Further, defendants contend that the Court should also dismiss

the claims against CGLIC because it had no duty to pay benefits under any circumstance.

### 2. Defendant CGLIC

CGLIC did not insure the Plan, but did perform services for it, including the determination of claims, pursuant to a written agreement. Under that agreement, CGLIC had the duty to determine claims, but Allied alone had the duty to pay benefits. Therefore, defendants contend and plaintiffs concede, both in their submissions and at oral argument, that this Court should dismiss the Complaint against CGLIC because it never had a duty to pay benefits. Accordingly, the claims against CGLIC hereby are dismissed.

### 3. The Claims Decisions

Effectively, plaintiffs' demands for payment were twofold: (1) plaintiffs insisted the Plan should pay for nursing services at a rate of $100 per hour; and (2) plaintiffs demanded that the Plan should pay for 24–hour care every day. During the claim procedure, the Plan responded to these demands by paying plaintiffs $55 per hour (the balance of the $100 demand, the parties agreed was to be litigated) and by making specific determinations about when nursing care was justified under the Plan terms.

■ *Plaintiffs' claims for the $100 per hour rate:* From late 1994 through the Fall of 1996, the Plan paid for around-the-clock nursing services for Mrs. Steiner, and since March 1995, had done so at the rate of $55 per hour. At the time of CNS's claim in February 1997, the Plan administrator, Ms. Welz, observed that the Plan had already paid over $800,000 to CNS for Mrs. Steiner's nursing services. The Plan directed CNS to submit proof to justify its continued demand for payment at $100 per hour.

The request notwithstanding, CNS expressly refused to submit concrete proof that: (1) $100 per hour was its own normal rate (apparently, on the theories that "[a]re these Defendants, or any ERISA Plan Administrator, entitled to know the intricate details of a provider's business?" and "ERISA is not a license for a Plan Administrator to engage in a wholesale invasion of these Plaintiffs' or any provider's privacy.)" Pls.' Mem. at 6–7; or (2) other agencies normally charge a comparable rate of $100 per hour. Plaintiff argues that defendants' request for concrete proof justifying the $100 per hour rate "was and continues to be unreasonable given the facts of this case ...." Pls.' Mem. at 2. Plaintiffs contend that it was sufficient and conclusive enough proof that it submitted evidence to defendant that "Defendants had paid the $100 per hour rate .... the proof requested by the plan is ridiculous given the fact that the Plan had already acknowledged the $100 per hour rate by paying it." *Id.* To be sure, during oral argument of this motion, plaintiffs relied solely on their argument that defendants' past payments constitute an admission that $100 per hour was the customary rate for comparable services in the particular locale. Indeed, this being the only point plaintiffs raise in five pages of the Memorandum addressing the issue, plaintiffs conclude that the decision to cease paying the $100 hour rate "was not justified on substantial evidence .... or evidence that a reasonable mind might accept it as adequate to support the conclusion reached.'" *Miller,* 72 F.3d at 1072. Furthermore, plaintiffs contend that the survey the Plan submitted "was and is defective," although plaintiffs fail to explain this assertion.

In reaching its determination not to pay the $100 rate, the Plan administrator noted, *inter alia,* plaintiffs' intentional and continued failure to submit evidence of other nursing facilities' typical rates for comparable services. This is true even though the administrator provided plaintiffs with the results of its own survey establishing that the usual rates were lower than $55 per hour.

Evidently, in their submission to this Court and during oral argument, plaintiffs trivialize the fact that despite defendants' numerous requests during the claims determination process for documentation or other proof justifying the $100 per hour rate, plaintiffs clearly refused to provide evidence (perhaps because they were unable to do so) supporting this demand. That defendants previously paid plaintiff the $100 per hour rate is wholly irrelevant to the inquiry of whether this amount was reasonable or customary. *See generally* Pls'. Mem. Indeed, to

justify this refusal to provide any other proof, plaintiffs urge "[n]o plan can simply request information for the sake of requesting it—and when that precise information is not provided—claim that a denial of benefits is reasonable." Pls.' Mem. at 6.

Despite defendants' numerous requests, plaintiffs intentionally ignored and failed to submit credible proof justifying their demand for payment at a $100 per hour. In light of the information defendants possessed during the claims determination process, their decision to reduce payments seems to have been more than reasonable and based on substantial evidence. Accordingly, defendants' motion for summary judgment on this issue hereby is GRANTED.

■ *Plaintiffs' Claims for Around–the–Clock Care:* In denying the claim for benefits for around-the-clock care, defendants assert that Mrs. Steiner's treating physician, Dr. Harold German, lacked credibility. According to defendants, the administrator received an unfavorable impression of Dr. German from his testimony before this Court during the early stages of this litigation. In addition to Dr. German's testimony, in denying claims for around-the-clock care, the Plan administrator Ms. Welz claims she considered the independent medical and nursing examinations of Mrs. Steiner, other personal medical records including reports from her pulmonologist, and CNS's own nursing reports. This evidence, coupled with plaintiffs' failure to provide additional medical proof that Mrs. Steiner required around-the-clock care justified defendants' determination to terminate benefits. *See* Defs'. Mem. at 9–10.

In opposition, plaintiffs contend that defendants' failed properly to review the ample medical evidence it possessed concerning Mrs. Steiner's prognoses, and defendants refused to evaluate doctors' notes concerning their examinations of plaintiff. *See generally* Pls'. Mem. at 3–5. This utter failure to assess significant medical information alone, plaintiffs urge, constitutes grounds upon which to conclude defendants' denial of benefits was arbitrary and capricious. *Id.* With regard to the past testimony of her treating physician before this Court, plaintiffs maintain that Dr. German testified only as to Mrs.

Steiner's care following a December 1997 hospitalization. Plaintiffs contend that there is no evidence that the nursing services from early 1995 were unnecessary or otherwise inappropriate. Pls'. Opp. at 4. Further, no medical doctor reviewed Mrs. Steiner's file to determine the propriety of the care prior to Dr. German's examination in January 1997. *Id.* at 5. The only attack on Dr. German's credibility comes from Ms. Welz, the administrator "who does not even have a college education" and Ms. Talento, a nurse. Accordingly, the "evidence used to rely on the denial of benefits on medical necessity was neither substantial, nor such that a reasonable mind might accept it as adequate .... It is unconscionable that an attorney, a high school graduate and a nurse can and should have the exclusive power to override the decisions of a treating medical doctor ... or for that matter, allegedly garner information about the patient's condition from the treating physician's notes only to contradict the treatment plan of the treating physician." Pls'. Mem. at 5. ERISA does not permit "non-doctors" to overturn the question of the necessity of medical care without the consultation of a medical doctor. *See Pritt v. United Mine Workers of America,* 847 F.Supp. 427 (S.D.W.Va.1994) (finding that a lack of medical necessity without an opinion from a competing medical doctor constituted an abuse of discretion).

The parties diverging characterization of the medical testimony and facts supporting defendants' denial of benefits, coupled with their conflicting arguments make one thing certainly clear: a genuine issue exists regarding whether defendants' decision to cease paying for around-the-clock care was reasonably made based upon substantial evidence. Because this determination is better left for the fact-finder, the parties' motion on this issue hereby is DENIED.

### CONCLUSION

For the reasons set forth herein:

1. The claims against defendant CGLIC are DISMISSED;

2. Defendants' decision not to pay plaintiffs $100 per hour for nursing

services was not arbitrary and capricious, and therefore, defendants' motion for summary judgment on this issue hereby is GRANTED while plaintiff's motion is DENIED; and

3. Because a genuine issue exists with regard to the reasonableness of defendant's decision to terminate payments for around-the-clock nursing services, the parties' cross-motions for summary judgment on this issue are DENIED.

SO ORDERED.